## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| MONICA GIORDANO, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) **Case No.** |
| ROMAN CATHOLIC BISHOP OF | ) |
| PORTLAND d/b/a Roman Catholic | ) |
| Diocese of Portland, | ) |
| | ) |
| Defendant. | ) |

## PLAINTIFF'S COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Monica Giordano, by and through undersigned counsel, hereby complains against Defendant Roman Catholic Bishop of Portland d/b/a Roman Catholic Diocese of Portland as follows:

## INTRODUCTION

1.      This case arises under the Federal Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq*.; Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. ("Title VII"); the Maine Human Rights Act ("MHRA"), 5 M.R.S. § 4571 *et seq*.; and the Maine Whistleblower Protection Act, 26 M.R.S. § 831 *et seq*. ("MWPA").

2.      This case challenges Defendant's:

(A)     Age discrimination against Plaintiff in violation of the ADEA and MHRA;

1

(B)    Unlawful sex-based discrimination and sex stereotyping of Plaintiff in violation of Title VII and the MHRA;

(C)    Religious discrimination against Plaintiff in violation of the MHRA;

(D)    Whistleblower retaliation against Plaintiff in violation of the MWPA; and

(E)    Interference, coercion, intimidation, and retaliation for opposing practices made unlawful by the MHRA.

## THE PARTIES

3.    Plaintiff Monica Giordano ("Giordano") is an individual residing in the Town of Sullivan, County of Hancock, and State of Maine.

4.    Defendant Roman Catholic Bishop of Portland d/b/a Roman Catholic Diocese of Portland ("RCBP") is Maine 501(c)(3) nonprofit religious organization that operates as a corporation sole under the tax-exempt umbrella of the United States Conference of Catholic Bishops. The RCBP operates and holds assets for all parishes, schools, and diocesan offices in Maine, including St. Joseph's church in Ellsworth.

5.    At all times herein relevant, Giordano was considered an employee of Defendant RCBP, which consistently employs more than 500 individuals.

## JURISDICTION AND VENUE

6.    Prior to filing this Complaint, Giordano filed a complaint of discrimination with the Maine Human Rights Commission ("MHRC") and the Equal

2

Employment Opportunity Commission ("EEOC") on or about September 12, 2023. Giordano amended her complaint on or about October 25, 2024.

7.     The MHRC found reasonable grounds to believe that discrimination occurred in this case and then issued a failed conciliation letter to Plaintiff on January 28, 2026.

8.     Venue is proper in this Court because all of the discriminatory practices alleged herein occurred in Penobscot county.

9.     The Court has federal question subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331.

## BACKGROUND FACTS

10.     Giordano is a 73-year-old female and a retired, ordained Congregational Minister.

11.     RCBP hired Giordano in or around October 2004 to work as a part-time administrative assistant at St. Joseph Catholic Church located at 231 Main Street in Ellsworth.

12.     A former Methodist school teacher named Scott Mower, who had converted to Catholicism to become a priest, first hired Giordano (a non-Catholic) to work for St. Joseph's. Over the years, subsequent priests were critical of the fact that Giordano was not a "real" Catholic.

13.     Several years later, in or around 2007, RCBP increased Giordano's weekly working hours and offered her employee benefits, including sick and vacation pay and retirement benefits.

14.    Giordano worked as an administrative assistant at St. Joseph's for almost 20 years, until the date of her termination from employment on July 19, 2023.

15.    RCBP's termination of Giordano's employment on July 19, 2023 violated the ADEA, Title VII, the MWPA, and the MHRA.

16.    As an administrative assistant at St. Joseph's, Giordano's job duties included maintaining Diocesan parish records, basic IT functions, cash responsibilities, scheduling, maintaining a church calendar, and editing a weekly bulletin.

17.    Giordano has a Bachelor of Arts in English and a Master of Divinity, and she was well qualified to perform her role at St. Joseph's for more than twenty years.

18.    Throughout her tenure with the RCBP, Giordano performed her job satisfactorily and was a competent administrative assistant supporting the priests and the church overall.

19.    After Giordano's termination from employment in July of 2023, the RCBP actively advertised to fill her position.

20.    At all times herein relevant, Father Emile Dube (hereinafter, "Dube") was a priest and pastor at St. Joseph's who acted as Giordano's supervisor.

21.    At all times herein relevant, Giordano's work schedule was Monday through Thursday, from 8 a.m. until 3 :30 p.m.

22.    In early 2023, Dube's behavior was becoming increasingly impulsive and reactionary, with inappropriate displays of anger in the workplace.

23. Giordano noticed Dube's increasingly concerning behavior and pointed out that he should address or otherwise improve it.

24. Dube reacted to Giordano's concerns about his behavior with retaliatory, discriminatory, and even more abusive behavior.

25. For years, Dube made direct, discriminatory statements to Giordano about her gender, and religious beliefs, along with her status as a Congregational minister.

26. Dube openly discriminated against Giordano because of her age, despite the fact that Giordano had always performed her job well.

27. Between January of 2023 and the date of her termination, Dube repeatedly referred to Giordano as "old" and inept. He loudly insisted he had already told Giordano things that he had not. Whenever Giordano pointed this out to Dube, he would insult her age by stating: "You're old!" or "You can't remember anything!"

28. Beginning in January of 2023, Dube attacked Giordano's age by stating that she was "too old," the work was "too much" for her to do, and she was "getting on" in age.

29. Dube specifically told Giordano: "You're getting on [in age], Monica. You can't follow directions."

30. Based on her age, Dube stated: "that day is coming" for her to retire.

31. On one occasion, Dube specifically said to Giordano, "who's the old one here?" suggesting that she was too old, not him.

32.     Dube received monthly shipments of adult diapers for his medical problems with incontinence. He repeatedly discussed the need for these diapers with Giordano in crude, inappropriate terms. Dube would hold up the box of adult diapers, look at Giordano, and say: "You're old enough to know what these are for, Monica!"

33.     Regarding Giordano's religious affiliation, Dube made the following discriminatory statements:

(A)     "You are outside the one true faith."

(B)     "You are denied eternal salvation," and "there is no salvation for you."

34.     Dube further denigrated Giordano's Protestant faith and said she was going to Hell because she did not follow the "one, true faith."

35.     Dube accused Giordano, and Protestants at large, of believing in "anything" they "want," and said Catholics were the superior faith because they had "rules" and "guidelines."

36.     One such rule in Catholicism that Dube favored was that women cannot be ordained. Dube clearly resented that Giordano was a female minister.

37.     Dube treated Giordano differently than similarly situated males or Catholics, targeting her for disparate and unfair treatment because of her gender and religion.

38.     Dube did not like women and denigrated them behind their backs. He avoided interacting with women whenever possible. Much of Giordano's working time

6

was spent speaking with and counseling female congregants. Dube expected Giordano to shield him from having to interact with these women.

39. Dube treated Giordano differently than similarly situated male employees.

40. For example, Dube expected Giordano to cook for potlucks at St. Joseph's, but he never expected male employees to help in the kitchen.

41. Dube repeatedly made remarks to married male employees that he expected their wives to cook for the potlucks.

42. When Dube did not like the food Giordano made for a potluck, he criticized her publicly, stating: "You're a woman, you should know how to cook!"

43. Giordano's office was located in a space that used to be occupied by the female live-in housekeeper for priests, who cooked all of their meals. When Dube introduced Giordano to people, he often remarked that she worked in the live-in space "where women belonged"—in the kitchen.

44. Dube made outrageous, discriminatory statements about female personality traits. He was fond of saying that men do not "weep and wail" about things or become emotional; only women do that.

45. Dube also said that women should learn to be "more like a man," and "accept things and move on."

46. Dube expected Giordano to perform tasks for him personally that fell beyond the scope of her job duties as an Administrative Assistant. Giordano had to drive Dube on personal errands like picking up his car at the dealership. Dube

expected Giordano to ask him what he wanted for lunch, pick it up, and then pay for it personally. Dube would never have expected a male employee in a support role to perform these kinds of tasks.

47.    Dube clearly treated Giordano like she was a stereotypical female caretaker (wife, mother, etc.), not like an employee who deserved respect and equal treatment in her role compared to male support staff.

48.    The RCBP historically underpaid Giordano. In January of 2005, she was paid $15/hour. Over ten years later, in 2016, Giordano still earned only $16.06 per hour.

49.    Between 2019 and 2023, Giordano received no pay increase or cost of living adjustment. Her hourly wage remained stagnant at $20.89 per hour.

50.    Upon information and belief, the RCBP paid male and/or younger employees in similar support roles better wages than Giordano.

51.    Dube displayed observable contempt toward Giordano based on her age, religious affiliation, and/or gender. These displays of contempt, and direct, discriminatory statements by Dube, were so frequent and severe that they created a hostile working environment that was intolerable.

52.    The hostile work environment created by Dube was made worse by him scratching, touching, or referring to his genitals at work. During the repeated instances when Dube would talk about his adult diapers, he indicated that his genitals were difficult to "fit" into the adult diaper. These comments created even more of an objectively and subjectively offensive environment at St. Joseph's.

8

53. In or around March of 2023, a newly hired employee named Marti Dayton ("Dayton"), began taking over certain administrative duties that Giordano had been doing for years. In hindsight, this was an overt effort by RCBP to encourage Giordano to leave her job.

54. Dayton was at least 10 years younger than Giordano, and RCBP showed preference in employment to Dayton, a new, younger employee, over Giordano.

55. Around the same time, Dube loudly told the male bookkeeper for St. Joseph's, within Giordano's earshot to make sure she overheard, to prepare and distribute raises for the rest of the staff, but not for Giordano.

56. In April of 2023, Dube became inappropriately angry and threw a temper tantrum during which he engaged in assaultive behavior by throwing papers in Giordano's direction, striking her in the face with the papers.

57. Dube's temper tantrum was in response to Giordano entering his office to discuss St. Joseph's Easter bulletin. Dube became increasingly enraged and aggressive as he reviewed the draft bulletin.

58. Dube yelled at Giordano, "Don't you listen??" and then approached her in an aggressive, hostile manner. Dube then stood directly toe to toe with Giordano, violating her personal space.

59. Dube swung his hand, full of papers, in Giordano's direction and flung them toward her face. The papers hit Giordano in the eyelid, nose, and cheek, which was not only humiliating but frightening.

60.    Giordano was shocked by Dube's assaultive behavior and could not believe she had papers literally thrown in her face. The papers fell to the floor and Dube looked out of control. He yelled at Giordano to: "Pick up those papers and just do it and get it right."

61.    Giordano hurried to gather the papers from the floor and make the revisions that Dube demanded, fearful of his behavior.

62.    When Giordano brought Dube back the revisions he had requested, he refused to review them and just ordered her to "go with" the revisions.

63.    Giordano reported Dube's assault to the Ellsworth Police Department. She also reported the assault to the RCBP's Director of Personnel, Elizabeth Allen ("Allen").

64.    Giordano informed Allen that Dube was behaving in a frightening, out of control manner, and she asked Allen for help.

65.    Giordano wrote an email to Allen on April 11, 2023, asking for her "best advice on a confidential matter." Giordano then asked Allen: "Is it appropriate for Priests in this Diocese to make life so miserable for their employees that they quit their job?"

66.    Giordano's April 11th email described the incident where Dube threw papers in her face and then told her: "I think it might be a good idea for you to look for another job." Giordano also described a history of "VERY abusive" behavior by Dube that included demeaning and unfairly chastising her.

67.     Giordano asked Allen to keep the complaint "between ourselves at the moment," but said that she thought Dube needed help, and she wanted to keep her job.

68.     Allen responded to Giordano's email within an hour, dismissively telling her if she wanted the complaint kept confidential "there is really nothing that I can do."

69.     Two days later, Giordano responded that she was fearful of losing her job and told Allen that Dube had said in the past: "No one challenges me and gets away with it!"

70.     A week later, on April 20, 2023, Giordano emailed Allen again with the subject line: "Non-Stop Aggression Please Help!" The email described Dube arriving at St. Joseph's and immediately demanding the thermostat key to turn the heat down. When Giordano said she had lost her key at home, Dube illegally threatened that he would take money out of her paycheck to cover the cost of the heat. Dube also had a key to the thermostat, which he had apparently lost too.

71.     During this interaction, Dube approached Giordano's desk aggressively and threatened: "One more time! One more time, and you're fired!"

72.     Giordano's April 20th email to Allen specifically described the interaction as frightening and said: "These threats and outbursts are giving me panic attacks and upset stomachs. I like my job, but the threatening words and behavior have to stop." Giordano begged Allen, "Please get him some help soon!"

73. Allen's only response to the April 20th email to was ask about a handyman who could access the thermostat. In response, Giordano expressed concern about losing her job, to which Allen responded: "There is a process for termination. So there is a guideline and it rarely is immediate."

74. Giordano heard nothing about her complaints to Allen in the weeks that followed.

75. On May 15, 2023, the new office manager for St. Joseph's, Dayton, emailed Giordano to suggest taking over the part of Giordano's job that involved preparing the church bulletin. Giordano recognized this as a discriminatory and retaliatory effort by RCBP to remove her job duties.

76. Giordano therefore emailed Allen on May 15 and May 16, 2023 with the subject: "This is just incredible," explained that Dayton appeared to be taking over part of her job, and also seemed to be her new supervisor. Giordano asked: "Do you see the progression of my walk out the door? This is simply wrong! Is the Church going to help me or not?"

77. Allen responded to Giordano's email without acknowledging her request for help or fear of termination. Instead, Allen said that Dube may be "using" Dayton as a "go between" because himself and Giordano, because Dube had been spoken to about his behavior.

78. During this timeframe and continuing into June of 2023, Dube's hostile and abusive conduct unreasonably interfered with Giordano's work performance and

12

created an intimidating, hostile, fearful, and offensive working environment. Being in the office was incredibly distressing due to fear, threats, and intimidation.

79.    Following the assault over the bulletin when papers were thrown directly in her face, Giordano experienced panic symptoms, decreased appetite, headaches, sleeplessness, and shortness of breath.

80.    Unbeknownst to Giordano, back on May 5, 2023, RCBP Monsignor Marc Caron ("Caron") spoke with Dube and told him about the complaint Giordano made about him. Caron minimized the veracity of Giordano's complaint, informing Dube that: "this employee has a history of making complaints against her supervisors in this position," which was a violation of personnel policies and the Diocesan Code of Ethics. Moreover, Caron's statement to Dube is direct evidence that Giordano's complaint was not believed or credited by RCBP.

81.    Following the Juneteenth holiday on June 19, 2023, Giordano took three days off for vacation because she found it intolerable to be in the office and needed a break.

82.    Because she was fearful of termination or retaliation by Dube and other RCBP employees, especially given Dube's overt threat of termination, Giordano removed some of the personal items at her desk prior to taking vacation time in late June. Giordano feared she would be fired while out on vacation and wanted to ensure she had her personal belongings, such as holiday decorations she had brought in, knickknacks, equipment she owned, and other things accumulated over more than 20 years of work.

83. Giordano did not remove these items because she intended to quit her job; she needed the income and had repeatedly expressed that she enjoyed her job and simply wanted the abusive and harassing conduct to cease.

84. On or about June 26, 2023, when Giordano returned to work from vacation, she found that work-related items at her desk had been cleared off, desk drawers were nearly emptied, most of her files in the filing cabinet had disappeared, her name had been removed from the phone, and she could not access messages on the phone. In addition, the breakroom refrigerator had been cleared of Giordano's personal items.

85. Giordano contacted Allen and reported the missing items. She also asked Allen if she had been fired. Giordano called Dube and Dayton as well, but neither of them answered her call.

86. In the meantime, Dayton wrote an email to Allen and Dube stating that Giordano "did not come into the office today because she thinks she's getting fired." In fact, Giordano had come into the office, and discovered her belongings were missing.

87. Giordano was also locked out of her computer. Rather than addressing why Giordano feared she had fired, Dube, Allen and Dayton set about using the computer access issue against Giordano, and asked IT to investigate her access history to prove it was her own fault she had been locked out of accessing her computer.

14

88.     On June 26, 2023, while in the office, Giordano put her timesheet on Dayton's desk and requested vacation through July 10, 2023, since she was unaware of her job status and the entire situation was causing immense emotional distress.

89.     On June 27, 2023, Dayton emailed Allen with a "Monica Update," stating that Giordano had been "making some very false accusations" and "spreading malicious information about" Dube and other office staff. Dayton referred to Giordano's complaints about Dube as "lies," which prompted RCBP to retaliate further against Giordano.

90.     After the vacation that she requested through July 10, 2023, Giordano came into the office and found the same sort of situation she experienced back on June 26, 2023 – personal items, files, and computer equipment had been removed, as well as her work phone. Giordano's desk had been completely cleared out.

91.     As a result, Giordano emailed Dube and then Allen to ask what her work status was. She informed Dube that, since she did not have a computer, phone, files, or anything else necessary to do her job, she was going home until she heard more about her status.

92.     Giordano returned to work the next day, on July 11, 2023, and her work-related items were still gone. Along with IT, Dayton helped get Giordano her computer and equipment set up again. When Giordano logged back into her computer, she discovered that all of her contacts had been deleted. Giordano was not the one who deleted these contacts.

93.    On or about Thursday, July 13, 2023, Giordano reported to a meeting with Dube, Dayton and Allen, who had traveled to Ellsworth from Portland. At the meeting, Allen questioned Giordano about the issue of work items being removed and bizarrely accused Giordano of doing it.

94.    Giordano explained that she had taken personal items of her own prior to going on vacation, but she did not remove anything work-related. Allen, Dube, and Dayton engaged in a pattern of gaslighting and retaliation.

95.    During the meeting, Giordano reiterated that Dube had previously assaulted her and behaved in a physically aggressive manner. Giordano asked what action had been taken to remedy her complaint about Dube but did not receive a response other than: "This is how the Church works."

96.    Instead of responding to Giordano's concerns, RCBP overtly retaliated against her with a memo of behavioral actions she needed to take in order to remain employed.

97.    The July 13, 2023 memo informed Giordano that her "accusations and rumors need to stop," and she needed to "be pleasant and positive with your coworkers."

98.    The memo also said that Giordano's complaints were making it "extremely difficult to continue to employ" her, and her "continued effort to work against us cannot go on."

99. The above memo constitutes direct evidence of retaliation for opposing practices made unlawful by Title VII, the ADEA, and the MHRA, as well as whistleblower retaliation.

100. The July 13, 2023 memo also falsely insinuated that Giordano had set up video recording equipment in the office of her own volition. In reality, however, Dube had directed Giordano to research and purchase a simple electronic security system for campus buildings. Dube wanted a card access security system, but it was too expensive and would have required construction and door replacements.

101. Dube asked Giordano to find a simpler and less expensive security system. Giordano did as instructed and purchased Simply Safe security equipment for the office, which included two outside door camera entry points and one camera at Giordano's desk. The main box for the security system was behind Giordano's chair on the counter.

102. Dube told Giordano to install the controls for the security system and monitor it on her personal cell phone.

103. A parishioner named John Whetstone ("Whetstone") learned of the security system that Giordano had purchased at Dube's direction. Whetstone had a background in IT and informed Giordano that the Simply Safe system was too easy to bypass. Whetstone told Giordano to obtain equipment from a company called Eufy instead.

104. Giordano returned the Simply Safe system and purchased the Eufy system on her personal credit card, which RCBP never fully reimbursed her for.

17

105. Whetstone set up door access points for the office front and back door, as well as two ceiling cameras in the parish hall and a camera on my desk, along with the main control box.

106. Dube was aware of the Eufy security system being installed and told Giordano she was responsible for monitoring it. Whetstone set himself up as another administrator of the security system.

107. The July 13, 2023 memo instructed Giordano that: "All recording and video equipment are to be removed completely from all offices in the building."

108. Giordano only set up the security system, including at her desk, because Dube specifically instructed her to do so. The July 13, 2023 memo misrepresented this fact, as though Giordano had done something wrong or unauthorized by having the equipment at her desk.

109. When RCBP instructed Giordano to remove the video equipment from her desk, she did as instructed. Giordano removed the main box behind her chair and the camera monitoring her desk and handed it to Dube in front of the bookkeeper.

110. Within days of her turning in the video equipment to Dube, Whetstone accused Giordano of stealing his security equipment. Whetstone rushed into Dube's office and RCBP called the police on Giordano, even though they knew that she had returned the equipment.

111. Giordano was humiliated and shocked to be stopped by the Ellsworth Police in the parking lot. The officer told Giordano he was aware that she had reported Dube's assault to the police. He asked if Giordano had taken the video

equipment and she said no, explaining that RCBP was trying to come up with reasons to fire her. Giordano never removed video equipment from the office and never heard from the police about the issue again.

112. Meanwhile, on July 17, 2023, Dayton wrote an email to Allen and Dube criticizing Giordano for disconnecting cameras/video equipment, but that is precisely what the July 13, 2023 memo instructed her to do.

113. On July 18, 2023, Giordano wrote an email to Dube and Dayton explaining that documents and items were disappearing from her desk and computer, which was true.

114. Giordano's July 18, 2023 email also explained that she turned in the video equipment to Dube as instructed "last Thursday, July 13, 2023 at approximately 2:15 pm," and then she deleted the app from her phone.

115. Dayton forwarded Giordano's July 18, 2023 email to Allen and said: "Monica continues her false accusations," but none of the foregoing statements in the email were false. Dayton told Allen, "I am getting very tired of this and need it to stop."

116. On July 19, 2023, Allen informed Giordano that the RCBP had decided that "it's time" to fire her, and "we're done."

117. After Giordano's termination, Dayton, Allen, and Dube all wrote false and defamatory statements intended to disparage Giordano and avoid the appearance of discrimination and retaliation that actually motivated Giordano's termination.

118. At least one of the false and defamatory statements made by RCBP after Giordano's termination occurred after she exercised the rights afforded to her by the MHRA by filing a complaint of discrimination with the MHRC on September 12, 2023.

119. In response to Giordano filing with the MHRC, Dayton wrote a defamatory memo intended to interfere, intimidate, and coerce Giordano in violation of the MRHA, attempting to silence her complaints.

120. Dayton's November 8, 2023 memo was itself a blatant, direct violation of the MHRA, because the memo falsely accused Giordano of "dishonesty" and outright theft of security equipment, as well as "aggressive" behavior and fraud. None of these accusations were true. In reality, RCBP was retaliating against Giordano for opposing practices made unlawful by the ADEA, Title VII, the MWPA, and the MHRA, and then filing a complaint of discrimination with the MHRC.

### COUNT I – AGE DISCRIMINATION IN VIOLATION OF THE ADEA
**(29 U.S.C. § 621 *et seq.*)**

121. Plaintiff Monica Giordano repeats the allegations contained in Paragraphs 1 through 120 of her Complaint as if fully stated herein.

122. For the reasons outlined above, the RCBP's stated reasons for terminating Giordano's employment were really pretext for age discrimination.

123. RCBP took adverse employment action against Plaintiff as a direct and proximate result of her age.

124. RCBP treated similarly situated younger employees more favorably than Plaintiff.

125. Direct evidence of age discrimination exists in this case.

126.   Defendant also created a hostile and abusive work environment based on Giordano's age, which was severe and pervasive.

127.   RCBP's subjectively and objectively offensive conduct created intolerable working conditions for Giordano based on age.

128.   Unlawful age discrimination has taken place within the meaning of the ADEA.

129.   Defendant discriminated against Plaintiff on the basis of age knowingly or with reckless disregard for whether its conduct was prohibited by the ADEA.

130.   Because Defendant's age discrimination was willful, Giordano is entitled to liquidated damages of twice the amount of her lost wages.

131.   As a result of Defendant's discriminatory actions, Giordano has suffered and is entitled to damages, including but not limited to: lost wages and benefits, front pay, compensatory damages including emotional pain and suffering and lost enjoyment of life, punitive damages for Defendant's reckless indifference to the laws prohibiting age discrimination in employment, attorney's fees, costs, and expenses.

WHEREFORE, Plaintiff Monica Giordano requests that this Honorable Court award her damages in the form of lost back pay, front pay, compensatory damages, liquidated damages, punitive damages, attorney's fees, costs and expenses, equitable and injunctive relief, and all other relief afforded to her by law.

## COUNT II – SEX-BASED DISCRIMINATION IN VIOLATION OF TITLE VII
(42 U.S.C. § 2000e *et seq.*)

132.   Plaintiff repeats the allegations contained in Paragraphs 1 through 131 of her Complaint as if fully stated herein.

133.    Giordano is female and a member of a protected class based on her sex.

134.    Title VII makes it illegal for an employer to discriminate against an employee based on sex.

135.    Defendant's action described above amounted to sex-based discrimination and disparate treatment of Giordano in violation of Title VII.

136.    Defendant's policies, procedures, retaliatory environment, and ignoring HR practices and Code of Ethics have a disparate impact on women like Giordano compared to their male counterparts or younger females.

137.    Defendant also engaged in sex stereotyping in violation of Title VII by making overtly discriminatory, negative, and stereotypical statements about women.

138.    Defendant's stated reason for terminating Giordano's employment were pretext for sex discrimination.

139.    Defendant also created a hostile and abusive work environment based on Giordano's sex, which was severe and pervasive.

140.    RCBP's subjectively and objectively offensive conduct created intolerable working conditions for Giordano based on sex.

141.    As a result of Defendant's discrimination and willful violation of Title VII, Giordano has suffered and is entitled to damages, including but not limited to: lost wages and benefits, front pay, compensatory damages including emotional pain and suffering and lost enjoyment of life, attorney's fees, costs and expenses.

WHEREFORE, Plaintiff Monica Giordano requests that this Honorable Court award her damages for Defendant's violation(s) of Title VII, in the form of lost back

pay, front pay, compensatory damages, liquidated damages, punitive damages, attorney's fees, costs and expenses, equitable and injunctive relief, and all other relief afforded to her by law.

### COUNT III – AGE AND SEX-BASED DISCRIMINATION IN VIOLATION OF THE MHRA
#### (5 M.R.S. § 4571 *et seq.*)

142. Plaintiff repeats the allegations contained in Paragraphs 1 through 141 of her Complaint as if fully set forth herein.

143. For the reasons set forth in Counts I and II above, age and sex-based discrimination have occurred in violation of the MHRA.

WHEREFORE, Plaintiff Monica Giordano respectfully requests that this Honorable Court enter judgment in her favor and against Defendant and award her compensatory damages, lost wages, liquidated damages, punitive damages, reasonable costs and attorney's fees, pre- and post-judgment interest, and such further relief the Court may deem proper.

### COUNT IV – RELIGIOUS DISCRIMINATION IN VIOLATION OF THE MHRA
#### (5 M.R.S. § 4571 *et seq.*)

144. Plaintiff repeats the allegations contained in Paragraphs 1 through 143 of her Complaint as if fully set forth herein.

145. The MHRA makes it illegal for an employer, including RCBP, to discriminate against an employee based on her religious affiliation.

146. Defendant's action described above amounted to religious discrimination and disparate treatment of Giordano in violation of the MHRA.

147. Defendant's stated reason for terminating Giordano's employment were pretext for religious discrimination.

148. Defendant also created a hostile and abusive work environment based on Giordano's religious affiliation, which was severe and pervasive.

149. RCBP's subjectively and objectively offensive conduct created intolerable working conditions for Giordano based on her religious affiliation.

150. As a result of Defendant's discrimination and willful violation of Title VII, Giordano has suffered and is entitled to damages, including but not limited to: lost wages and benefits, front pay, compensatory damages including emotional pain and suffering and lost enjoyment of life, attorney's fees, costs and expenses.

WHEREFORE, Plaintiff Monica Giordano respectfully requests that this Honorable Court enter judgment in her favor and against Defendant and award her compensatory damages, lost wages, liquidated damages, punitive damages, reasonable costs and attorney's fees, pre- and post-judgment interest, and such further relief the Court may deem proper.

## COUNT V – VIOLATION OF THE MWPA
### (26 M.R.S. § 831 *et seq.*)

151. Plaintiff repeats the allegations contained in Paragraphs 1 through 150 of her Complaint as if fully set forth herein.

152. For the reasons set forth above, Giordano engaged in protected activity within the meaning of the Maine Whistleblower Protection Act by reporting that Dube assaulted her and engaged in threatening, abusive behavior at work.

153. Giordano had a reasonable, good-faith basis for believing that Dube's actions were illegal.

154. Defendant took adverse action against Giordano because of her protected activity, and a causal connection existed between Giordano's protected activity and Defendant's adverse action.

155. As a result of Defendant's discriminatory and retaliatory actions, Giordano has suffered and is entitled to damages, including but not limited to: lost wages and benefits, compensatory damages including emotional pain and suffering and lost enjoyment of life, liquidated and punitive damages, attorney's fees, costs and expenses.

WHEREFORE, Plaintiff Monica Giordano respectfully requests that this Honorable Court enter judgment in her favor and against Defendant and award her compensatory damages, lost wages, liquidated damages, punitive damages, reasonable costs and attorney's fees, pre- and post-judgment interest, and such further relief the Court may deem proper.

## COUNT VI – INTERFERENCE, INTIMIDATION, AND COERCION IN VIOLATION OF THE MHRA
### (5 M.R.S. § 4633)

156. Plaintiff repeats the allegations contained in Paragraphs 1 through 155 of her Complaint as if fully set forth herein.

157. The MHRA makes it illegal for an employer to "discriminate against any individual because that individual has opposed any act or practice that is unlawful

under this Act or because that individual made a charge, testified, assisted or participated in any manner in an investigation, proceeding or hearing under this Act.

158.   For all of the reasons set forth above, RCBP retaliated against Giordano for opposing practices made unlawful by the ADEA, Title VII, the MHRA, and the MWPA.

159.   RCBP interfered with Giordano's rights under the MHRA, and attempted to intimidate or coerce her to avoid making further truthful statements in pleadings before the MHRA.

160.   RCBP specifically wrote a false, defamatory, and utterly baseless memo articulating reasons for terminating Giordano that included theft, fraud, and aggressive behavior. None of these false accusations were true but were instead acts of retaliation and interference under the MHRA.

161.   As a result of Defendant's retaliation and willful interference, intimidation, or coercion, Giordano has suffered and is entitled to damages, including but not limited to: lost wages and benefits, front pay, compensatory damages including emotional pain and suffering and lost enjoyment of life, attorney's fees, costs and expenses.

WHEREFORE, Plaintiff Monica Giordano respectfully requests that this Honorable Court enter judgment in her favor and against Defendant and award her compensatory damages, lost wages, liquidated damages, punitive damages, reasonable costs and attorney's fees, pre- and post-judgment interest, and such further relief the Court may deem proper.

## JURY TRIAL DEMAND

Plaintiff Monica Giordano hereby demands a jury trial on all matters so triable under the laws and Constitution of the United States and the State of Maine.

Respectfully submitted,

Dated: April 23, 2026

*/s/ Laura H. White*

_____

Laura H. White, Bar No. 4025
*Attorney for Plaintiff*
WHITE & QUINLAN, LLC
62 Portland Rd., Suite 21
Kennebunk, ME 04043
(207) 502-7484
*lwhite@whiteandquinlan.com*

*/s/ Danielle Quinlan*

_____

Danielle Quinlan, Bar No. 5480
*Attorney for Plaintiff*
WHITE & QUINLAN, LLC
62 Portland Rd., Suite 21
Kennebunk, ME 04043
(207) 502-7484
*dquinlan@whiteandquinlan.com*